Derek A. Newman, State Bar No. 190467
*dn@newmanlaw.com*
Sarah L. Forney, State Bar No. 254769
*sf@newmanlaw.com*
NEWMAN DU WORS LLP
100 Wilshire Blvd., Suite 700
Santa Monica, CA 90401
Telephone:     (310) 359-8200
Facsimile:     (310) 359-8190

Counsel for Plaintiff
Conversion Logic, Inc.

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CONVERSION LOGIC, INC., a Delaware corporation, <br><br> Plaintiff, <br><br> v. <br><br> MEASURED, INC., a Delaware corporation; TREVOR TESTWUIDE, an individual; MADAN BHARADWAJ, an individual; and ANTONIO MAGNAGHI, an individual, <br><br> Defendants. | Case No. 2:19-cv-05546 <br><br> **COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES** <br><br> **DEMAND FOR JURY TRIAL** |

Under 28 U.S.C. § 1331 (federal question) and 18 U.S.C. § 1836 et seq. (Defend Trade Secrets Act of 2016), Plaintiff Conversion Logic, Inc. alleges for its complaint against Defendants Measured, Inc., a Delaware corporation, Trevor Testwuide, an individual, Madan Bharadwaj, an individual, and Antonio Magnaghi, an individual, on personal information as to Conversion Logic's owns activities, and upon information and belief as to the activities of others, as follows:

# INTRODUCTION

1.     Plaintiff Conversion Logic offers software and services that provide businesses with insight about which marketing efforts generate a return on investment in the form of actual customer purchases.

2.     To develop its proprietary system, Conversion Logic invested over $25 million in research and development. In addition, Conversion Logic created a set of confidential business, scientific, technical, economic, and engineering information—including patterns, plans, compilations, program devices, formulas, designs, prototypes, specifications, methods, techniques, capabilities, processes, procedures, programs, and codes—which Conversion Logic has taken many cautious and protective measures to keep secret.

3.     Defendant Trevor Testwuide was Conversion Logic's CEO. Defendants Madan Bharadwaj and Antonio Magnaghi were Conversion Logic's formal advisors.

4.     While at Conversion Logic, Testwuide, Bharadwaj, and Magnaghi each had access to all of Conversion Logic's scientific and technical trade secrets. Those include confidential and proprietary information related to Conversion Logic's machine-learning-based techniques, methodologies, and data-science models. They also had access to Conversion Logic's sales-related trade secrets including confidential customer and sales information such as current and prospective customer lists, contact information, pricing information, and contracts.

5.     Defendants Testwuide, Bharadwaj, and Magnaghi each agreed not to use or disclose Conversion Logic's confidential, proprietary, or trade secret information.

6.     Defendants Testwuide and Bharadwaj also both agreed not to solicit any Conversion Logic employees or Conversion Logic customers.

7.     In 2017, Conversion Logic offered Testwuide a generous separation agreement, including a windfall of both accelerated stock options and forgiveness of

1  a several-hundred-thousand-dollar loan. In exchange, Conversion Logic
2  requested—and Testwuide agreed—that he not disparage the company, solicit
3  customers, advisors, or employees, or use Conversion Logic's information and
4  trade secrets.

5      8.    Yet Testwuide and Bharadwaj stole and used Conversion Logic's trade
6  secrets, confidential and proprietary information, and intellectual property for the
7  purpose of starting a competing venture, including both before and during
8  Testwuide's negotiation for a separation agreement.

9      9.    Testwuide represented falsely during that negotiation that he had not
10  used Conversion Logic's trade secrets—knowing full well that he had. He
11  concealed that he had created a competing company and solicited a Conversion
12  Logic advisor—while agreeing to terms prohibiting such violations. Conversion
13  Logic relied on his representations, which induced it to agree to the separation
14  agreement.

15      10.   In 2017, within mere weeks of Testwuide's leaving the company,
16  Testwuide and Bharadwaj started Defendant Measured to compete against
17  Conversion Logic by using the trade secrets they stole from it. Defendant
18  Magnaghi joined them and used Conversion Logic's trade secrets to help build
19  Measured.

20      11.   Testwuide and Bharadwaj also solicited Conversion Logic's customers
21  and former employees in violation of their agreements.

22      12.   Finally, in direct violation of his separation agreement, Testwuide has
23  repeatedly disparaged Conversion Logic, including to Conversion Logic's investors
24  and potential investors as well as customers, about Conversion Logic's technology
25  and products. Ironically, Testwuide and Measured made these disparaging
26  statements about Conversion Logic to promote and differentiate the Measured
27  product—which in truth is based entirely on Conversion Logic's technology.

28

13.   Conversion Logic files this lawsuit to recover damages from, among other things, Defendants' misappropriation of trade secrets, breaches of contract, and fraud. Conversion Logic also seeks an injunction to stop Defendants' misappropriation of its trade secrets.

## PARTIES

14.   Plaintiff Conversion Logic, Inc. is a Delaware corporation qualified to do business in California with its principal place of business at 12300 Wilshire Boulevard, Suite 200, Los Angeles, CA 90025.

15.   Defendant Measured, Inc. is a Delaware corporation qualified to do business in California with its principal place of business at 3023 Glenn Avenue, Santa Monica, CA 90405.

16.   Defendant Trevor Testwuide is an individual who resides in Los Angeles County, California.

17.   Defendant Madan Bharadwaj is an individual who resides in Billerica, Massachusetts. Bharadwaj frequently travels to Los Angeles County, California in connection with his duties as Defendant Measured's Chief Technology Officer.

18.   Defendant Antonio Magnaghi is an individual who resides in Los Angeles County, California.

## JURISDICTION AND VENUE

19.   This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because this case presents a federal question under the trade-secret laws of the United States, 18 U.S.C. § 1836 et seq. This Court has supplemental jurisdiction over the state-law claims under 28 U.S.C. § 1367(a) because they are so related to claims in the action within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

20.   This Court has personal jurisdiction over Defendant Measured because Measured has its principal place of business in Santa Monica, California, so it has systematic and continuous contacts with California.

21.   This Court has personal jurisdiction over Defendant Testwuide because he resides in Los Angeles County, California, so he has systematic and continuous contacts with California. The Court also has personal jurisdiction over Testwuide because he purposefully directed wrongful activities within California and with Plaintiff Conversion Logic in California by stealing Conversion Logic's trade secrets from its office and computers in Los Angeles, California. Testwuide also consummated a transaction in California with Conversion Logic by executing a separation agreement in California that he breached in California. Conversion Logic's claims raised in this complaint all arise out of and are related to Testwuide's California-related activities.

22.   This Court has personal jurisdiction over Defendant Bharadwaj because he is the Chief Technology Officer of Defendant Measured, Inc., which is based in California and which he visits frequently—constituting systemic and continuous contact with California. The Court also has personal jurisdiction over Bharadwaj because he purposefully directed wrongful activities within California and with Plaintiff Conversion Logic in California by stealing Conversion Logic's trade secrets from its office and computers in Los Angeles, California. Bharadwaj also consummated a transaction in California with Conversion Logic by executing an agreement in California that he breached in California. Conversion Logic's claims raised in this complaint all arise out of and are related to Bharadwaj's California-related activities.

23.   This Court has personal jurisdiction over Defendant Magnaghi because he resides in Los Angeles County, California, so he has systematic and continuous contacts with California. The Court also has personal jurisdiction over Magnaghi because he purposefully directed wrongful activities within California and with Plaintiff Conversion Logic in California by stealing Conversion Logic's trade secrets from its office and computers in Los Angeles, California. Conversion

1  Logic's claims raised in this complaint arise out of and are related to Magnaghi's
2  California-related activities.

3      24.   Venue is proper in this Court under 28 U.S.C. § 1391(b) and (c) because
4  Measured has its principal place of business in Los Angeles County, transacts
5  business here, and is subject to personal jurisdiction here. Venue is also proper in
6  this Court because both Testwuide and Magnaghi reside in and are subject to
7  personal jurisdiction in this district. Finally, venue is proper in this Court because
8  the events giving rise to Conversion Logic's claims, including misappropriation of
9  trade secrets and other tortious and wrongful acts, occurred in Los Angeles
10 County.

11                          **FACTUAL BACKGROUND**

12 **A.  Conversion Logic's business depends on its proprietary machine-learning
13      techniques, models, and software, and its confidential customer and sales
14      information.**

15     25.   Plaintiff Conversion Logic offers professional services and proprietary
16 software to measure its customers' marketing performance across multiple media.
17 With its services, Conversion Logic's customers gain insight into how many of
18 their own users become paying customers—which is called "conversion."

19     26.   In addition to its core product, Conversion Logic offers marketing
20 measurement, analytics, planning, simulation, and optimization services and
21 software.

22     27.   Conversion Logic's unique capabilities are due to proprietary software
23 that performs automated data collection, processing, and transformation.

24     28.   Conversion Logic analyzes massive data sets collected from
25 communication and interactions across several marketing channels, such as
26 television, radio (traditional and digital), catalogue, direct and shared mail, online
27 search, promotional emails, and social media. It uses its proprietary software to

28

compile, analyze, and model this information to reveal how each marketing touchpoint comparatively results in customers buying products online or in stores.

29.   Founded in 2014 under the name "Data Cloud Inc.," Conversion Logic spent several years and invested over $25 million dollars to develop its business, including its proprietary machine-learning processes, techniques, models, and software.

30.   Now, Conversion Logic has an international presence with clients spanning the globe, including major brand-name customers such as Microsoft, General Motors, SoFi, and Twilio.

31.   Conversion Logic's confidential machine-learning processes and techniques include proprietary applications of various machine-learning and data analytics. These include, by way of example, "follow-the-regularized-leader" (FTRL) algorithms, predictive "time series" algorithms, gradient-boosting machine (GBM) algorithms, linear-regression methods, and neural networks.

32.   Conversion Logic uses these machine-learning processes and techniques within different proprietary models or frameworks, including proprietary "ensemble" methods that combine multiple base techniques (e.g. FTRL and time-series algorithms) into one predictive model.

33.   Conversion Logic has developed proprietary software capable of displaying the predictive results of its machine-learning techniques and models.

34.   The software is compatible with a wide variety of standard marketing tools.

35.   Conversion Logic derives economic value from its proprietary machine-learning processes, techniques, models, and software. Its proprietary machine-learning processes, techniques and models, and its proprietary software, allow Conversion Logic to differentiate itself from competition in the marketplace.

36.   Conversion Logic's processes, techniques and models—and its proprietary software—allow Conversion Logic to attract new customers and revenue and facilitate its ongoing services.

37.   Conversion Logic's proprietary machine-learning processes, techniques, models, and software have been recognized as uniquely innovative.

38.   In 2016, Conversion Logic's "XC Logic" platform was selected for Digiday's 2016 Signal Award for the "Best Marketing Analytics/Attribution Platform" due to its innovative approach.

39.   In 2017, Forrester Research recognized Conversion Logic as a "Breakout Vendor" in marketing measurement and optimization solutions.

40.   Conversion Logic's proprietary machine-learning processes, techniques, models and software are not generally known to the public nor to others who can obtain economic value from its disclosure or use. From its outset, Conversion Logic has protected the confidentiality of its machine-learning processes, techniques, models, and software by, among other things, requiring each of its employees to sign confidentiality agreements as a condition of their employment.

41.   Since its founding, Conversion Logic has maintained a practice of restricting access to the databases in which its proprietary processes, techniques, models, and software are developed through secure password-protected software.

42.   Conversion Logic's materials describing these processes, techniques, models, and software are stored in secure password-protected company databases, with restricted and password-protected employee access, and have been stored this way since before Testwuide joined the company.

43.   Conversion Logic has also consistently required any third party with a legitimate interest in viewing these aspects of the technology to sign a non-disclosure agreement. This includes potential customers, third-party vendors, potential investors, consultants, and advisors, including Bharadwaj and Magnaghi.

44.     From its outset, Conversion Logic developed and maintains non-public databases of information relating to its customers and prospective customers, as well as non-public sales information such as account contacts, pricing information, contract details, subscription agreements, revenues, and other customer relationship information.

45.     For years, Conversion Logic has maintained its non-public sales information in Salesforce.com, a Customer Relationship Management database, with restricted and password-protected access.

46.     Conversion Logic maintains additional non-public sales information in other non-public databases, and this information has been stored in such a manner since before Testwuide joined the company.

47.     Each of these systems is password-protected and access is restricted to Conversion Logic employees who have a reason to access, and have been protected in this way since before Testwuide joined the company.

48.     Conversion Logic's sales and customer information is not generally known to the public and is not disclosed to those who could obtain economic value from its disclosure or use.

49.     Conversion Logic's non-public sales information provides it with a competitive advantage. It enables Conversion Logic to build and leverage its goodwill in the community and lower its cost of customer acquisition. These records are used to generate new business to provide revenue for Conversion Logic and to facilitate ongoing services to its current customer base.

50.     The confidential identity of, and information concerning, Conversion Logic's customers is critical to Conversion Logic's business.

51.     Conversion Logic protects the confidentiality of its customer and sales records in Salesforce.com and other databases by, among other things, requiring its employees to sign employment contracts that include strict confidentiality

provisions and by restricting access to these records through secure, password-protected software and tools.

**B.    Testwuide had access to Conversion Logic's confidential and proprietary trade secrets and agreed not to use or disclose this information.**

52.    Defendant Testwuide joined Conversion Logic as CEO on May 1, 2014.

53.    Although Testwuide was not a founding member of Conversion Logic, he was granted a "Co-Founder" title upon joining the company.

54.    As a condition of his employment with Conversion Logic (operating under the name Data Cloud, Inc. at the time), Testwuide signed a "Confidentiality, Inventions and Non-Solicitation Agreement" on May 1, 2014.

55.    In his Confidentiality Agreement, Testwuide agreed not to use or disclose any confidential or proprietary information of the company—a term that survives his employment with Conversion Logic:

> Employee acknowledges that the Confidential Information (as defined below) constitutes a protectable business interest of the Company, and covenants and agrees that at all times during the period of Employee's employment, and at all times after termination of such employment, Employee will not, directly or indirectly, disclose, furnish, make available or utilize any Confidential information other than in the course of performing duties as an employee of the Company . . . Employee's obligations under this Section 1.a. with respect to particular Confidential Information will survive expiration or termination of this Confidentiality, Inventions and Non-Solicitation Agreement (this "Agreement"), and Employee's employment with the Company, and will terminate only at such time (if any) as the Confidential Information in question becomes generally known to the public other than through a breach of Employee's obligations under this Agreement.

56.    Testwuide also agreed that, upon termination of employment, he would return all confidential information to Conversion Logic, including Conversion Logic's property:

Employee will leave with, or promptly return to, the Company all documents records notebooks, magnetic tapes, disks or other materials, including all copies in Employee's possession or control which contain Confidential Information or any other information concerning the Company, any of its Affiliates or any of its or their products, services or clients, whether prepared by the Employee or others.

57.   To the extent that Testwuide developed any inventions, discoveries, improvements or concepts related to the technological aspects of Conversion Logic's product offering, Testwuide, assigned all of these inventions to Conversion Logic under the terms of his Confidentiality Agreement.

58.   In addition to these confidentiality and assignment provisions, Testwuide agreed not to solicit, for one year after termination of his employment, any Conversion Logic employee or any individual or entity that was a customer or vendor of the company. Specifically, in the Confidentiality Agreement, Testwuide agreed:

a. Employee will not, during the term of Employee's employment with the Company and for one year thereafter (the "Restricted Period"), directly or indirectly (whether as an owner, partner, shareholder, agent, officer, director, employee, independent contractor, consultant, or otherwise) with or through any individual or entity:

   i.   Employ, engage or solicit for employment any individual who is, or was at any time during the twelve-month period immediately prior to the termination of Employee's employment with the Company for any reason, an employee of the Company or any of its Affiliates or otherwise seek to adversely influence or alter such individual's relationship with the Company or any of its Affiliates;

   ii.   Solicit or encourage any individual or entity that is, or was during the twelve-month period immediately prior to the termination of Employee's employment with the Company for any reason, a prospective Affiliate of the Company or a customer or vendor or prospective customer or vendor of the

Company or any of its Affiliates to terminate or otherwise alter his, her or its relationship with the Company or any of its Affiliates; or

   b. The Restricted Period shall be extended for a period equal to any time period that Employee is in violation of this **Section 5**.

59. Testwuide agreed to assign to Conversion Logic any inventions that relate to Conversion Logic's business and that are developed within one year following the termination of his employment with Conversion Logic.

60. Testwuide was regularly present in Conversion Logic's physical office and had access to Conversion Logic's confidential and proprietary information and intellectual property.

61. As CEO, Testwuide oversaw all functions within the business. Testwuide has unfettered access to all company materials, both physical and digital. This included access to:

- Conversion Logic's confidential and proprietary information and materials related to the research and development of its machine-learning processes, techniques, algorithms, predictive models, mathematical computations, and patent applications;

- Conversion Logic's confidential and proprietary information and materials related to the engineering, development and implementation of Conversion Logic's product platform and solution offerings;

- Conversion Logic's confidential and proprietary information and materials related to its customer and prospective customer relationships, product pricing, contract pricing, and other confidential contract terms and conditions;

- Conversion Logic's key confidential and proprietary business strategy documents, including its go-to-market plans, product roadmaps, business planning, financial planning, board meetings, and fundraising strategy

1       and efforts, including venture capital contacts.

2       62.    As part of Conversion Logic's measures to secure and protect its

3    confidential and proprietary information, when Testwuide joined Conversion

4    Logic, he was provided with a company laptop, which he could use to access

5    Conversion Logic's confidential and proprietary materials including password-

6    protected databases.

7       63.    Testwuide had unfettered access to all of Conversion Logic's engineers,

8    data scientists, and product team members, along with access to all password-

9    protected databases (including, for example, Dropbox, internal wikis, and ticketing

10   systems) in which information and materials relating to the machine-learning

11   techniques, algorithms, models, and product platform development are and were

12   maintained.

13      64.    Testwuide had unfettered access to all of Conversion Logic's sales

14   representatives and to all password-protected databases in which Conversion

15   Logic's protected customer relationship and sales-related information are and were

16   maintained, including Salesforce.com, SmartSheets, and Google Drive network.

17      65.    As CEO and President, Testwuide had unfettered access to all of

18   Conversion Logic's executives, board members, consultants, and business

19   advisors, who shared with him confidential and proprietary information and

20   materials related to Conversion Logic's business strategy.

21      66.    As CEO and President, Testwuide was also responsible for guarding and

22   protecting the Company's confidential and proprietary information. This

23   responsibility included requiring and enforcing Non-Disclosure Agreements with

24   third parties such as customers, vendors, advisors, and consultants. Testwuide was

25   responsible for the internal maintenance and enforcement of Conversion Logic's

26   Confidentiality, Inventions, and Non-Solicitation Agreement, including by

27   requiring each new hire to sign this Agreement upon commencing their

28   employment.

67.   As CEO and President of Conversion Logic, Testwuide made discoveries, inventions, improvements, and other work product in connection with providing his services to Conversion Logic, all of which he assigned to Conversion Logic.

68.   The Confidentiality Agreement is a valid and enforceable agreement.

69.   At all times, Conversion Logic performed all obligations required of it under the Confidentiality Agreement.

70.   At no time was Testwuide's performance under the Confidentiality Agreement excused.

**C.   Testwuide received two-million shares of stock in Conversion Logic and a $200,000 loan from the company before he was demoted as CEO in 2016.**

71.   Conversion Logic paid Testwuide a base salary of $150,000 per year, along with a grant of the right to purchase restricted stock units.

72.   On August 21, 2014, Testwuide was granted the right to purchase 2,000,000 shares of Conversion Logic's common stock.

73.   Immediately upon this grant, Testwuide exercised his right to purchase all 2,000,000 shares of restricted common stock units.

74.   Conversion Logic provided Testwuide with a loan in the amount of the purchase price, $200,000. The loan to Testwuide was due on or before August 21, 2017, including the principal and interest at 10% per annum.

75.   During the course of his tenure with Conversion Logic, Testwuide made no payments to Conversion Logic to offset the principal or interest of the loan.

76.   In April 2016, out of dissatisfaction with Testwuide's performance as CEO, the Conversion Logic Board elected to terminate Testwuide as CEO. Subsequently, it offered Testwuide the newly-formed role of President, effective May 1, 2016.

77.   In a memorandum reflecting this decision, the Board of Directors confirmed that Testwuide would be held to the terms of his Confidentiality Agreement.

78.   Testwuide begrudgingly accepted the role of President and resigned from the Board of Directors.

79.   In his role as President, Testwuide reported to the new and current Chief Executive Officer, Brian Baumgart, Founder and Chairman.

80.   In Testwuide's position as President of Conversion Logic, the scope of confidential and proprietary information that he had access to did not change. No changes were made to Testwuide's access privileges to Conversion Logic's protected databases in which its confidential and proprietary information and materials were and are maintained.

81.   In Testwuide's role as President of Conversion Logic, he continued to exercise discretionary authority to manage corporate affairs on Conversion Logic's behalf. In this role, he conducted business on Conversion Logic's behalf, signed binding agreements, hired consultants, and managed a team of sales employees.

**D.   Madan Bharadwaj became a technical advisor and consultant to Conversion Logic and agreed not to worked with competitors or to share the trade secrets he had access to.**

82.   Madan Bharadwaj, a former colleague of Testwuide's, began work with Conversion Logic as a consultant and an advisor starting in June 2015.

83.   On June 15, 2015, Bharadwaj signed an Advisor Agreement with Conversion Logic to "consult with and advise Company from time to time, at Company's request, upon activities relating to advising and assisting with strategic matters."

84.   In his Advisor Agreement, Bharadwaj covenanted not to use or disclose Conversion Logic's trade secrets and confidential proprietary information:

> Advisor agrees that all Inventions and other business, technical, and financial information (including, without limitation, the identity of and information relating to Company's customers or employees) Advisor obtains from or assigns to Company, or learns in connection with the Services, constitute "Proprietary Information." Advisor will hold in confidence and not disclose or, except in performing the Services, use any Proprietary Information…Upon termination or as otherwise requested by Company, Advisor will promptly return to Company all items and copies containing or embodying Proprietary Information.

85.   Bharadwaj assigned to Conversion Logic all intellectual property and other ownership rights to any inventions, ideas, or information he developed in connection with his services to Conversion Logic:

> Company shall own all right, title and interest (including patent rights, copyrights, trade secret rights, mask work rights, trademark rights, *sui generis* database rights and all other intellectual and industrial property rights of any sort throughout the world) relating to any and all inventions (whether or not patentable), works of authorship, mask works, designations, designs, know-how, ideas and information made or conceived or reduced to practice, in whole or in party, by Advisor that arise out of or in connection with the Services or any Proprietary Information (as defined below) (collectively, "Inventions") and Advisor will promptly disclose and provide all inventions to Company. Advisor agrees to make and hereby makes all assignments necessary to accomplish the foregoing.

86.   Bharadwaj further covenanted not to work for direct competitors of Conversion Logic and to take reasonable commercial efforts to inform Conversion Logic in the event a conflict of interest arises:

> While this Agreement is in effect Advisor will not provide services to any company that directly competes with the business of Company in the functional and business areas that the Advisor is engaged with the Company…Company and Advisor acknowledge that companies change competitive focus from time to time and

they will each take commercially reasonable efforts to keep each other informed and help each other manage conflict of interest.

87.   Bharadwaj agreed not to solicit Conversion Logic's employees:

Advisor agrees that during the term of this Agreement and for one year thereafter, Advisor will not encourage or solicit any employee or consultant of Company to leave Company for any reason.

88.   In exchange for these promises, Bharadwaj received an option to purchase 30,000 shares of Conversion Logic's common stock, vesting in June 2018. Bharadwaj currently retains these vested stock options. Conversion Logic also agreed to reimburse Bharadwaj for expenses in connection with his engagement.

89.   As an advisor to Conversion Logic, Bharadwaj focused his services on building upon Conversion Logic's existing confidential and proprietary data science efforts and other technical matters. Bharadwaj worked closely with Conversion Logic employees, including its Chief Science Officer and Head of Engineering, and their respective teams. His work heavily involved Conversion Logic machine-learning methodologies, including methods for media attribution, marketing measurement, analytics, user interface, and the development of algorithms to capture these attributions.

90.   As a technical advisor to Conversion Logic, Bharadwaj also served as a sounding board to Conversion Logic to address issues and questions related to projects and initiatives for existing and prospective clients.

91.   Conversion Logic also retained Bharadwaj in a consulting capacity at various times to assist with technical initiatives and customer-specific projects.

92.   Conversion Logic retained Bharadwaj from September 2015 through April 2016 to help create marketing and cross-channel attribution reports and to develop methods for including certain algorithms and models in Conversion Logic's product platform, among numerous other tasks. This engagement was

memorialized in Bharadwaj's September 24, 2015 Independent Contractor Agreement with Conversion Logic ("First Consulting Agreement").

93. In his First Consulting Agreement, Bharadwaj acknowledged his engagement would include exposure to Conversion Logic's confidential and proprietary information. Bharadwaj agreed not to use or disclose this confidential information—a term that survives the First Consulting Agreement. He further agreed to return all materials containing proprietary information immediately upon the termination of his engagement.

94. Bharadwaj assigned to Conversion Logic all rights and interests in any discoveries or work product "made during the term of his engagement with Company in connection with the performance of services for Company, whether pursuant to this Agreement or otherwise."

95. Conversion Logic retained Bharadwaj as a consultant again in June 2016 through June 2017. This engagement was memorialized in Bharadwaj's June 1, 2016 Consulting Services Agreement with Conversion Logic ("Second Consulting Agreement").

96. The Second Consulting Agreement was executed with Bharadwaj's consultancy firm "Right Measures Consulting." Bharadwaj is the apparent principal and sole owner of Right Measures Consulting.

97. The Second Consulting Agreement identifies no corporate form for Right Measures Consulting. "Right Measures Consulting" is not a registered business with the Secretary of the Commonwealth of Massachusetts, the California Secretary of State, or the Secretary for the State of Delaware. Bharadwaj personally signed the Second Consulting Agreement and provided the same address he had provided in his Advisor Agreement, which he signed in his personal capacity.

98. Bharadwaj personally provided services related to Conversion Logic's work with one of its customers, HP.

99. The engagement under the Second Consulting Agreement included technical services related to the modeling and design of Conversion Logic's custom solution for HP. Bharadwaj was directly and deeply involved in this engagement.

100. In the Second Consulting Agreement, Bharadwaj agreed not to use or disclose Conversion Logic's confidential and proprietary information. Bharadwaj agreed not to:

> (i) copy or reproduce the Confidential Information or sell, assign, license, sublicense, or transfer, in whole or in part, or disclose, the Confidential Information to any other person or entity, without the prior written consent of Conversion Logic;

> (ii) decompile, disassemble or reverse engineer any computer program supplied to the Consultant as part of the Confidential Information; or

> (iii) incorporate the Confidential Information, or any portion thereof, into information belonging to the consultant, without the prior, specific written consent of Conversion Logic in each instance.

101. Bharadwaj further agreed to assign all rights and interests in any work product "arising out of or resulting from Consultant's performance under this Agreement."

102. Beginning as early as June 15, 2015, Bharadwaj had access to Conversion Logic's confidential information, including trade secrets and proprietary information related to Conversion Logic's machine-learning-based processes, techniques, methodologies, and data science models as well as software development and design.

103. As an advisor and consultant to Conversion Logic, Bharadwaj visited Conversion Logic's office on several occasions between June 2015 and June 2017.

104. As an advisor and consultant to Conversion Logic, Bharadwaj was granted physical and digital access to Conversion Logic technical information, materials, and databases.

105.  As an advisor and consultant to Conversion Logic, Bharadwaj made discoveries, inventions, improvements, and other work product in connection with providing his services to Conversion Logic, all of which he assigned to Conversion Logic.

106.  The Advisor Agreement is a valid and enforceable agreement.

107.  At all times, Conversion Logic performed all obligations required of it under the Advisor Agreement.

108.  At no time has Bharadwaj's performance under the Advisor Agreement been excused.

109.  At no time has Bharadwaj sought to terminate the Advisor Agreement.

110.  Bharadwaj's First Consulting Agreement is a valid and enforceable agreement.

111.  At all times, Conversion Logic performed all obligations required of it under the First Consulting Agreement.

112.  At no time has Bharadwaj's performance of the surviving terms under the First Consulting Agreement been excused.

113.  The Second Consulting Agreement with Bharadwaj is a valid and enforceable agreement.

114.  At all times, Conversion Logic performed all obligations required of it under the Second Consulting Agreement.

115.  At no time has Bharadwaj's performance of the surviving terms under the Second Consulting Agreement been excused.

**E.    Magnaghi became a technical advisor to Conversion Logic and agreed not to worked with competitors or to share the trade secrets he had access to.**

116.  Antonio Magnaghi began work with Conversion Logic as an advisor starting in August 2014.

117.  On August 26, 2014, Magnaghi entered into an Advisory Services Letter Agreement with Conversion Logic (under the name Data Cloud, Inc. d/b/a Conversion Logic) to serve on its Board of Advisors.

118.  In his Advisor Agreement, Magnaghi covenanted not to use or disclose Conversion Logic's trade secrets and confidential proprietary information:

> Agreement Not to Disclose. Advisor acknowledges that the Confidential Information (as defined below) constitutes a protectable business interest of the Company, and covenants and agrees that at all times during the period of Advisor's Services, and at all times after termination of such Services, Advisor will not, directly or indirectly, disclose, furnish, make available or utilize any Confidential information other than in the course of performing the Services as an Advisor to the Company.
>
> ***
>
> Advisor's obligations under this Section 4(a) with respect to Confidential Information will survive expiration or termination of this Agreement and Advisor's Services. Advisor agrees to protect and safeguard the secrecy of and avoid disclosure or use of Confidential Information of the Company and Advisor shall prevent it from falling into the public domain or the possession of persons other than those persons expressly authorized under this Agreement (if any) to receive any such Confidential Information.

119.  Magnaghi assigned to Conversion Logic all intellectual property rights to any inventions, ideas, or discoveries developed in the course of performing his advisory services to Conversion Logic:

> To the extent that, in the course of performing the Services, Advisor conceives, develops, or reduces to practice any "Inventions" (defined below), whether or not patentable or registrable under copyright or similar laws, Advisor hereby agrees to assign all rights, title and interest to such Inventions to the Company; provided that this paragraph shall not apply to any such inventions or works conceived, developed or reduced to practice by Advisor wholly independent of the Company or wholly outside the scope of the Services.

In accordance with Magnaghi's Advisory Agreement, "Inventions" include ideas, discoveries and developments that are:

> conceived or developed by Advisor during the term of this Agreement or Advisor's Services or within one (1) year following termination of this Agreement and the Services which relate to or result from the actual or anticipated business, work, research or investigation of the Company or any of its Affiliates or which are suggested by or result from any task assigned to or performed by Advisor for the company or any of its affiliates.

120.  Magnaghi further covenanted that he would not violate any duty to others and agreed to take reasonable commercial efforts to inform Conversion Logic in the event a conflict of interest arises:

> <u>No Conflicts.</u> Advisor represents that Advisor's compliance with the terms of this Agreement and provision of Services hereunder will not violate any duty which Advisor may have to any other person or entity (such as a present or former employer), including obligations concerning providing services to others, confidentiality of proprietary information and assignment of inventions, ideas, patents or copyrights, and Advisor agrees that Advisor will not do anything in the performance of Services hereunder that would violate any such duty. In addition, Advisor agrees that, during the term of this Agreement, prior to performing any services for or otherwise participating in a company developing or commercializing new services, methods or devices that may be competitive with the Company, Advisor shall first notify the Company in writing. It is understood that in such event, the Company will review whether Advisor's activities are consistent with Advisor remaining a member of the Company's Advisory Board.

121.  In exchange for these promises, Magnaghi received an option to purchase 15,000 shares of Conversion Logic's common stock, vesting in September 2017. Magnaghi currently retains these vested stock options.

1  Conversion Logic also agreed to reimburse Magnaghi for expenses in connection

2  with his engagement.

3      122.  As an advisor to Conversion Logic, Magnaghi focused his services on

4  building upon Conversion Logic's existing confidential and proprietary data

5  science efforts and other technical matters. Magnaghi worked closely with

6  Conversion Logic employees, including its Chief Science Officer and Head of

7  Engineering, and their respective teams. His work heavily involved Conversion

8  Logic machine-learning methodologies, including methods for media attribution,

9  marketing measurement, analytics, user interface, and the development of

10  algorithms to capture these attributions.

11      123.  As a technical advisor to Conversion Logic, Magnaghi also served as a

12  sounding board to Conversion Logic to address issues and questions related to

13  projects and initiatives for existing and prospective clients.

14      124. As an advisor and consultant to Conversion Logic, Magnaghi visited

15  Conversion Logic's office in Los Angeles on several occasions.

16      125.  As an advisor and consultant to Conversion Logic, Magnaghi was

17  granted physical and digital access to Conversion Logic technical information,

18  materials, and databases.

19      126.  As an advisor and consultant to Conversion Logic, Magnaghi made

20  discoveries, inventions, improvements, and other work product in connection with

21  providing his services to Conversion Logic, all of which he assigned to Conversion

22  Logic.

23      127.  Magnaghi's Advisor Agreement is a valid and enforceable agreement.

24      128.  At all times, Conversion Logic performed all obligations required of it

25  under the Advisor Agreement.

26      129.  At no time has Magnaghi's performance under the Advisor Agreement

27  been excused.

28      130.  At no time has Magnaghi sought to terminate the Advisor Agreement.

**F.  Testwuide deceptively negotiated a Separation Agreement with Conversion Logic by not disclosing he had founded a directly competing company.**

131.  Testwuide resigned from Conversion Logic on January 27, 2017.

132.  When Testwuide left Conversion Logic, he took with him confidential and proprietary Conversion Logic information including Conversion Logic's technical and sales-related trade secrets.

133.  Upon leaving, Testwuide also took with him discoveries, inventions, improvements, and other work product that he had assigned to Conversion Logic.

134.  Before leaving Conversion Logic, Testwuide planned to take with him this confidential and proprietary information and copied information from Conversion Logic's secured and password-protected databases onto his company-issued laptop.

135.  On or about February or March 2017, Testwuide returned a laptop to Conversion Logic. This laptop was wiped of any information or files.

136.  Testwuide destroyed, rather than return the Conversion Logic confidential and proprietary information that was on this laptop. Testwuide also destroyed all evidence of his theft of confidential and proprietary information that he had copied from Conversion Logic's secured and password-protected databases.

137.  At the time of Testwuide's departure, Conversion Logic CEO Baumgart reiterated to Testwuide the importance of his obligations under the Confidentiality Agreement. On January 24, 2017 Baumgart reminded Testwuide via email that he had previously attempted to show Baumgart confidential materials from his former employer, which Baumgart had refused. Baumgart advised Testwuide that similar behavior with Conversion Logic's confidential information could result in legal action.

138.  Testwuide sought to extract a favorable separation agreement from Conversion Logic. These negotiations lasted from January through August 2017.

But in those months, Testwuide founded a directly competing company based on stolen trade secrets with the assistance of an advisor he had solicited away from the company.

139.  During the course of negotiating his separation agreement, Testwuide intentionally and deceptively hid from Conversion Logic not only that he had stolen Conversion Logic's trade secrets for the benefit of the competing company but also that he had co-founded this competing company with a Conversion Logic advisor that he had solicited. Instead, Testwuide negotiated separation terms that he had already violated and that he had no intention to abide by.

140.  On January 26, 2017, in an email to Baumgart titled "Re: Thank you!" Testwuide represented that he would agree to terms that included a provision "not to solicit any Conversion Logic employees for 1 year." On or around that date, however, Testwuide had begun soliciting a Conversion Logic advisor, Madan Bharadwaj, to co-found a competing company together with him.

141.  On January 30, 2017, in an email to Baumgart, Testwuide represented that he had "been extremely cooperative during this entire separation process."

142.  In further negotiations in July and August 2017, Testwuide purported to negotiate the terms of his separation agreement in good faith. For example, on August 11, 2017, while negotiating the terms of this agreement, in an email titled "Thoughts on Next Steps," Testwuide represented to Baumgart that he desired to be a professional ally to Conversion Logic: "[O]f course I want to be a professional ally to you and CL." Testwuide further stated in that same email that both he and Bharadwaj would be ambassadors for and support Conversion Logic, stating: "I do think Madan and I can help, if nothing more as brand ambassadors eyes/ears in the market." Testwuide knew at the time that these representations were false. Both he and Bharadwaj had already founded a company that competes directly against Conversion Logic.

143.  Testwuide's false statements were designed to deceive Conversion Logic and procure terms in his favor in the separation agreement. Had Conversion Logic known these representations were false, it would have behaved differently, not only in the course of negotiating Testwuide's separation agreement but in seeking immediate recourse against at least Testwuide, Bharadwaj, and Measured.

144.  In this and all other communications throughout the course of negotiation his separation agreement, Testwuide continued to conceal that he had stolen Conversion Logic trade secrets and property, had already founded a competing company using that stolen information, and solicited a known Conversion Logic advisor to co-found that directly competing company together with him. These were facts that only Testwuide was in a position to know. Testwuide intentionally kept the competing company secret by operating in stealth mode. Conversion Logic could not have known of these facts. Had Conversion Logic known these facts, it would have behaved differently.

145.  In fact, Testwuide intended to protect himself in the event that Conversion Logic found out about these facts. On August 24, 2017, in an email titled "Agreement," Testwuide sought to have the "Release of Claims" and California Civil Code Section 1542 waiver provisions of the draft agreement apply mutually, such that Conversion Logic would release all claims against him. Testwuide knew that he had already violated his Confidentiality Agreement in numerous ways and breached his fiduciary duty to the company. He attempted to protect himself both by concealing these material facts from Conversion Logic and by attempting to induce Conversion Logic to waive any such claims against him.

146.  On August 31, 2017, Testwuide signed a Separation Agreement with Conversion Logic.

147.  In his Separation Agreement, Testwuide affirmatively acknowledged that "during the course of Employee's employment with the Company Employee had access to a number of highly confidential materials." Testwuide agreed not to use

or disclose Conversion Logic's confidential and proprietary information in accord

with the terms set forth in the Confidentiality Agreement:

> Employee reaffirms and agrees to observe and abide by the terms of the Confidentiality Agreement, specifically including the provisions therein regarding nondisclosure of the Company's trade secrets and confidential and proprietary information… Employee specifically represents that Employee shall refrain from using any such confidential information in the future.

148. Testwuide disingenuously affirmed that he had returned all confidential and proprietary materials to Conversion Logic, including any property provided to him:

> Employee affirms that Employee has returned all documents and other items provided to Employee by the Company, developed or obtained by Employee in connection with Employee's employment with the Company, or otherwise belonging to the Company.

149. Testwuide reaffirmed his agreement to the terms of the Confidentiality Agreement that he would not solicit anyone who had been an employee of Conversion Logic for the preceding twelve months.

150. Testwuide further agreed not to disparage Conversion Logic. Specifically, Testwuide, agreed to:

> refrain from any disparaging statements about the Company or any of the other Releasees including, without limitation, the business, products, intellectual property, financial standing, future, or employment/compensation/benefit practices of the Company.

151. In exchange for the covenants in his Separation Agreement, Conversion Logic forgave the principal and interest payments owed under the 2014 Loan Agreement, in the amount of $260,000. In addition, Conversion Logic accelerated the vesting schedule for 125,000 unvested shares. Conversion Logic allowed Mr. Testwuide to keep an aggregate of 1,375,000 shares of common stock.

152. Conversion Logic's forgiveness of Testwuide's loan and acceleration of shares were contingent upon Testwuide's "signing and not revoking this Agreement and otherwise fulfilling the material terms of this Agreement."

153. Conversion Logic would not have provided these benefits to Testwuide had Testwuide disclosed that he had stolen trade secrets from Conversion Logic and had formed a competing company using that stolen information and had solicited a Conversion Logic advisor to co-found that competing company together with him.

154. If Conversion Logic had known about this material information that Testwuide intentionally withheld while negotiating his Separation Agreement, it would not have forgiven his loan or accelerated shares of common stock.

155. The Separation Agreement is a valid and enforceable agreement.

156. At all times, Conversion Logic performed any and all obligations required of it under the Separation Agreement.

157. At no time was Testwuide's performance under the Separation Agreement excused.

158. Testwuide is a shareholder of Conversion Logic. Testwuide owes Conversion Logic a fiduciary duty to deal with Conversion Logic in good faith.

159. Testwuide breached his fiduciary duty to Conversion Logic by failing to negotiate his Separation Agreement with Conversion Logic in good faith, by founding a directly competing company during his employment with Conversion Logic, by using stolen Conversion Logic trade secrets to do so, and by keeping each of these facts secret from Conversion Logic.

**G.   Testwuide and Bharadwaj stole Conversion Logic's trade secrets to start Measured, a competing company.**

160. On or about February 2017, and at least by March 13, 2017, Testwuide and Bharadwaj co-founded Measured, Inc.

161.  At that time, Testwuide and Bharadwaj together secretly founded Measured in "stealth" mode. Testwuide co-founded Measured within one month of his departure from Conversion Logic. Bharadwaj co-founded Measured during the period of his advisory engagement with Conversion Logic and during the term of his Second Consulting Agreement with Conversion Logic.

162.  Measured's only founders are Testwuide and Bharadwaj.

163.  Measured, Inc. is a software company that offers a product to measure marketing performance across multiple marketing channels.

164.  Measured is a direct competitor to Conversion Logic. Both companies offer cross-channel marketing measurement products and services including cross-channel marketing and media analytics, cross-channel attribution, cross-channel incrementality, scenario planning, simulation, and experimentation.

165.  Measured was built based on confidential and proprietary information that Testwuide and Bharadwaj stole from Conversion Logic.

166.  Before leaving Conversion Logic, Testwuide engaged in conversations with Conversion Logic's customers to solicit them to become customers of Measured, his new competing company.

167.  Before leaving Conversion Logic, Testwuide also engaged in conversations with Conversion Logic's employees, consultants, and advisors, to solicit them to become employees of Measured.

168.  Testwuide was able to establish Measured so quickly after leaving Conversion Logic—within a matter of weeks—because while at Conversion Logic, he stole trade secrets, confidential and other proprietary information and improperly solicited Conversion Logic employees, advisors, and customers.

169.  On or about May 14, 2019, Measured emerged from stealth mode to present its cross-channel marketing-measurement product publicly.

170.  Measured describes its product offering using language that is extremely similar to Conversion Logic. For example, on its website, Conversion Logic

describes one portion of its platform as providing: "Cross-Channel Insights" allowing a user to "Understand incrementality between channels." Measured similarly explains on its website that its product focuses on "Cross-channel Attribution & Planning," including "cross-channel reporting centralized in a single source-of-truth dashboard powered by advanced incrementality measurement."

171. In a publicly-available corporate video for Measured from April 2019, Bharadwaj speaks on Measured's behalf as its Co-Founder and Chief Technology Officer. He confirms that Measured's technology is based on Bharadwaj and Testwuide's direct and first-hand exposure and experience with the technology that was developed at and belongs to Conversion Logic. He states:

> All the technology in Measured is born out of first-hand experiences working with brands on accurate and trusted cross-channel measurement. It became obvious to us that always-on experimentation combined with a wholistic cross-channel framework is the answer.

172. In this video, Bharadwaj goes on to state that the solution Measured purports to offer is based on "many years working on the problem."

173. Measured's cross-channel marketing measurement product could not have been built but for confidential and proprietary information that was developed in the preceding several years at Conversion Logic. Testwuide and Bharadwaj had access to and stole this confidential and proprietary information from Conversion Logic and disclosed it to Measured to build a competing product.

174. Measured's cross-channel marketing measurement product could not have been built but for intellectual property and work product that Testwuide and Bharadwaj developed at Conversion Logic and that properly belongs to Conversion Logic.

175. Any inventions, ideas, discoveries, and work product that Testwuide developed at Measured between January 2017 and January 2018 constitute

1 | inventions that are rightfully owned by Conversion Logic and should have been
2 | assigned Conversion Logic in accord with his Confidentiality Agreement.

3 | 176.  Any inventions, ideas, discoveries, and work product that Bharadwaj
4 | developed at Measured constitute inventions that are rightfully owned by
5 | Conversion Logic and should have been assigned to Conversion Logic in accord
6 | with his Advisor Agreement and Second Consulting Agreement.

7 | 177.  Testwuide violated the terms of his Confidentiality Agreement and
8 | Separation Agreement by stealing Conversion Logic's confidential and proprietary
9 | information and disclosing them to Measured.

10 | 178.  Testwuide is in breach of his fiduciary duty of good faith in dealing with
11 | Conversion Logic by founding a company that is a direct competitor to Conversion
12 | Logic while he was employed at Conversion Logic.

13 | 179.  Testwuide is in breach of his fiduciary duty of good faith in dealing with
14 | Conversion Logic by misappropriating its trade secrets for the benefit of a direct
15 | competitor while he was employed at Conversion Logic.

16 | 180.  Bharadwaj violated the terms of his Advisor Agreement and Consulting
17 | Agreements by stealing Conversion Logic's confidential and proprietary
18 | information and disclosing them to Measured.

19 | 181.  Measured is unjustly enriched from the use of Conversion Logic's
20 | misappropriated trade secrets and other proprietary information.

21 | 182.  Neither Measured nor either of its co-founders were required to invest in
22 | developing Measured's underlying technology because its technology is derived
23 | from Conversion Logic's.

24 | 183.  Conversion Logic invested several years and over $25 million dollars to
25 | independently develop its proprietary platform as well as its customer and sales
26 | information. Measured gained an unfair advantage by stealing that proprietary and
27 | confidential information from Conversion Logic. Measured was able to go to

28 |

1  market more quickly and bore less risk in developing a business in a market that

2  Conversion Logic had already established.

3  **H.   Testwuide and Bharadwaj improperly solicited Conversion Logic**

4  **employees and advisors to work for their direct competitor, Measured.**

5  184.  Testwuide improperly recruited and solicited Bharadwaj to join him in

6  co-founding Measured.

7  185.  Testwuide knew that Bharadwaj had been a consultant for and is an

8  advisor to Conversion Logic. Testwuide himself executed Bharadwaj's Advisor

9  Agreement and Consulting Agreements on Conversion Logic's behalf.

10  186.  As part of Testwuide's solicitation of Bharadwaj to become a co-founder

11  and employee of Measured, Testwuide conspired with Bharadwaj to steal

12  Conversion Logic's trade secrets to start this new company. Testwuide concealed

13  this fact from Conversion Logic while in negotiations for his separation agreement

14  with them from January 2017 through August 2017. Testwuide further concealed

15  this fact from Conversion Logic by conspiring with Bharadwaj to launch Measured

16  in "stealth" mode.

17  187.  Testwuide violated Section 5(a)(i) of his Confidentiality Agreement and

18  Section 11 of his Separation Agreement by soliciting Bharadwaj, a Conversion

19  Logic advisor and consultant, to become an employee of Measured. In so doing,

20  Testwuide sought to adversely influence or alter Bharadwaj's relationship with

21  Conversion Logic.

22  188.  Testwuide also violated Section 5(a)(ii) of his Confidentiality Agreement

23  and Section 11 of his Separation Agreement by soliciting Bharadwaj, a Conversion

24  Logic advisor and consultant, to become an employee of Measured. Bharadwaj was

25  not only an advisor to Conversion Logic but also a vendor. In soliciting Bharadwaj,

26  Testwuide sought to encourage him to terminate or otherwise alter his relationship

27  with Conversion Logic.

28

189.  Testwuide is in breach of his fiduciary duty of dealing with Conversion Logic in good faith by soliciting a known advisor of Conversion Logic to work for a directly competing company.

190.  Bharadwaj improperly recruited and solicited Testwuide to join him in co-founding Measured.

191.  Bharadwaj knew that Testwuide had been an employee of Conversion Logic. Bharadwaj's work with Conversion Logic involved frequent and regular contact with Testwuide, who had signed each of his Advisor Agreement and Consulting Agreements.

192.  As part of Bharadwaj's solicitation of Testwuide to become a co-founder and employee of Measured, Bharadwaj conspired with Testwuide to steal Conversion Logic's trade secrets to found the company. Bharadwaj concealed this fact from Conversion Logic by failing to disclose to Conversion Logic his work for a direct competitor, as required by his Advisor Agreement. Bharadwaj further concealed this fact from Conversion Logic by conspiring with Testwuide to launch Measured in "stealth" mode.

193.  Bharadwaj violated Section 4 of his Advisor Agreement and Section 10 of his Second Consulting Agreement by recruiting Testwuide, a former employee of Conversion Logic, to join Measured. In soliciting Testwuide, Bharadwaj sought to encourage him to terminate his relationship with Conversion Logic. Bharadwaj did so on or before April 2017, during the effective term of his Second Consulting Agreement. Bharadwaj did not seek Conversion Logic's written consent to solicit Testwuide for employment with Measured.

194.  Bharadwaj has also violated Section 1 of his Advisor Agreement and Section 10 of his Second Consulting Agreement by engaging in work for and providing services to a company known to Bharadwaj to be a direct competitor to Conversion Logic. Bharadwaj joined a directly competing company while continuing to serve as an advisor to Conversion Logic.

195.  Both Testwuide and Bharadwaj improperly recruited and solicited other former Conversion Logic employees to become employees of Measured.

196.  Both Testwuide and Bharadwaj improperly solicited Dean Polley, a former employee of Conversion Logic, to become an employee of Measured.

197.  Conversion Logic hired Dean Polley on May 5, 2015 in the role of Advertiser Solutions. Polley remained in Conversion Logic's continuous employment for the next two years. Polley's last date of employment with Conversion Logic was May 26, 2017.

198.  On or before May 26, 2018, both Testwuide and Bharadwaj solicited Polley to become an employee of Measured.

199.  Polley currently works as a Solutions Analyst at Measured.

200.  Testwuide has violated Section 5(a)(i) of his Confidentiality Agreement and Section 11 of his Separation Agreement by soliciting Polley, who was known to Testwuide to be a former Conversion Logic employee. Testwuide solicited Polley within one year following the termination of his own employment with Conversion Logic and within a year following Polley's employment with Conversion Logic. Testwuide's improper solicitation of Polley extends the applicable Restrictive Period of Section 5 of Testwuide's Confidentiality Agreement.

201.  Testwuide is in breach of his fiduciary duty of good faith in dealing with Conversion Logic by soliciting a Conversion Logic employee to work for a direct competitor.

202.  Bharadwaj has violated Section 4 of his Advisor Agreement and Section 10 of his Second Consulting Agreement by soliciting Polley, who was known to him to be a former Conversion Logic employee. Bharadwaj solicited Polley while serving as an Advisor to Conversion Logic. Bharadwaj solicited Polley within one year following the termination of Bharadwaj's Second Consulting Agreement and within a year following Polley's employment with Conversion

Logic. Bharadwaj's improper solicitation of Polley is a violation that extends the restrictive period of Section 10 of his Second Consulting Agreement.

203. Both Testwuide and Bharadwaj improperly solicited Antonio Magnaghi, an advisor of Conversion Logic, to become an advisor for Measured.

204. Magnaghi, who was brought on as an Advisor to Conversion Logic in August 2014, remains an advisor to Conversion Logic.

205. Magnaghi currently serves as an advisor to Measured.

206. Testwuide has violated Section 5(a)(ii) of his Confidentiality Agreement and Section 11 of his Separation Agreement by soliciting Magnaghi, who was known to Testwuide to be a Conversion Logic advisor. Testwuide himself negotiated the terms of Magnaghi's Advisor Agreement with Conversion Logic.

207. Testwuide solicited Magnaghi within one year following the termination of his own employment with Conversion Logic, at which time Magnaghi was still an advisor to Conversion Logic. Testwuide's improper solicitation of Magnaghi extends the applicable Restrictive Period of Section 5 of Testwuide's Confidentiality Agreement.

208. Testwuide is in breach of his fiduciary duty of good faith in dealing with Conversion Logic by soliciting a Conversion Logic advisor to work for a direct competitor.

209. Bharadwaj has violated Section 4 of his Advisor Agreement and Section 10 of his Second Consulting Agreement by soliciting Magnaghi, who was known to him to be another advisor to Conversion Logic. Bharadwaj solicited Magnaghi while both were serving as advisors to Conversion Logic. Bharadwaj solicited Magnaghi within one year following the termination of Bharadwaj's Second Consulting Agreement. Bharadwaj's improper solicitation of Magnaghi is a violation that extends the restrictive period of Section 10 of his Second Consulting Agreement.

210.  Measured has been unjustly enriched by the improper acts of solicitation of each of its employees. Measured was unjustly enriched by Testwuide and Bharadwaj's conspiracy to steal Conversion Logic's trade secrets which included Testwuide's solicitation of Bharadwaj and Bharadwaj's solicitation of Testwuide. This enrichment occurred at the expense of Conversion Logic, which had invested years and over $25 million dollars in developing its proprietary technical and customer information.

I.   **Testwuide and Bharadwaj stole Conversion Logic's customers for their competing company, Measured.**

211.  Testwuide, Bharadwaj, and Measured have stolen or attempted to solicit and steal existing and potential customers from Conversion Logic using Conversion Logic trade secrets, including customer relationship information, as well as sales contracts and pricing information.

212.  On April 1, 2016, AARP Services, Inc. became a customer of Conversion Logic, as reflected in the terms of their Master Subscription Services Agreement. AARP agreed to continue to be a customer of Conversion Logic until either party terminated the AARP Master Agreement.

213.  AARP was a prominent customer for Conversion Logic.

214.  Testwuide has personal knowledge of and was directly involved in Conversion Logic's relationship with AARP, including knowledge of the terms of its agreements such as pricing and services offered. Testwuide executed the AARP Master Agreement on Conversion Logic's behalf.

215.  Bharadwaj, by nature of his ongoing advisory engagement and consulting engagement with Conversion Logic, knew or would have reason to know of Conversion Logic's customer relationship with AARP.

216.  Between April 2016 through January 2018, Conversion Logic executed multiple sales orders with AARP to provide subscription and support services as part of their ongoing relationship with AARP under the AARP Master Agreement.

1  Testwuide executed several of these sales orders on Conversion Logic's behalf
2  while President of Conversion Logic.

3      217.  Bharadwaj, as an advisor to and consultant of Conversion Logic, was also
4  aware of Conversion Logic's customer relationship with AARP.

5      218. AARP was a customer of Conversion Logic at least through March 2018,
6  after the date of Testwuide's termination.

7      219.  On or around the time of his departure from Conversion Logic,
8  Testwuide stole Conversion Logic's confidential and proprietary sales information
9  related to the AARP account, including business contact information, contract
10  terms such as the AARP Master Agreement, and pricing information, among other
11  information.

12      220. On or about May 14, 2019, when Measured emerged from stealth mode,
13  it announced via press release and on the "Clients" page of its website that it had
14  numerous customers, and specifically featured its relationship with AARP.

15      221.  On or before January 27, 2018, Testwuide solicited and encouraged
16  AARP to become a customer of Measured.

17      222. On or before June 1, 2018, Bharadwaj solicited and encouraged AARP to
18  become a customer of Measured.

19      223.  At least by May 14, 2019, Testwuide and Bharadwaj together conspired
20  on Measured's behalf to solicit and encourage AARP to become a customer of
21  Measured.

22      224. Testwuide and Bharadwaj, on Measured's behalf, relied on stolen trade
23  Conversion Logic confidential and proprietary sales information related to the
24  AARP account to solicit and encourage AARP to become a customer of Measured.

25      225. Defendants intentionally interfered with Conversion Logic's contract
26  and business relationship with AARP.

27
28

226. Defendants have attempted to solicit and steal other existing and potential customers from Conversion Logic and have intentionally attempted to interfere with Conversion Logic's contracts with other existing customers.

227. Testwuide's solicitation of AARP through misappropriated Conversion Logic trade secrets violates Section 3 of his Confidentiality Agreement, in which he covenanted not to use or disclose Conversion Logic's trade secrets.

228. By soliciting AARP, Testwuide also violated Section 5(a)(ii) of his Confidentiality Agreement, in which he covenanted not to solicit or encourage any Conversion Logic customer or entity that was a customer during the twelve-month period prior to his termination. The Restricted Period controlling Section 5(a)(ii) of Testwuide's Confidentiality Agreement extends to at least January 27, 2018. The Restricted Period also covers any time period in which Testwuide is in violation of Section 5 of the Confidentiality Agreement.

229. Testwuide is in breach of his fiduciary duty of good faith in dealing with Conversion Logic by using misappropriated trade secrets to solicit a known customer of Conversion Logic.

230. Bharadwaj's solicitation of AARP through misappropriated Conversion Logic trade secrets violates Section 3 of his Advisor Agreement and Section 8 of his Second Consulting Agreement, in which he covenanted not to use or disclose Conversion Logic confidential trade secrets.

231. By soliciting AARP, Bharadwaj also violated Section 10(ii) of his Second Consulting Agreement, in which he had covenanted not to solicit customers of Conversion Logic, including for a period of one year following the termination of his Second Consulting Agreement. This period extends to at least June 1, 2018.

232. Measured would not have established a sales relationship with AARP but for the confidential information that Testwuide and Bharadwaj misappropriated from Conversion Logic.

233.  Measured would not have established a sales relationship with AARP but for Testwuide and Bharadwaj's improper solicitation of known Conversion Logic customers.

234. Measured has been and continues to be unjustly enriched by Conversion Logic's misappropriated sales-related trade secrets, including but not limited to the AARP account.

235.  Measured also has been and continues to be unjustly enriched by Testwuide and Bharadwaj's improper solicitation of Conversion Logic's customers, including but not limited to AARP.

236.  Measured's unjust enrichment is at the expense of Conversion Logic, which has invested many years over $25 million dollars in developing its proprietary customer information, pricing, contracts, service offerings, subscription offerings, and terms of service. Starting at least as early as April 2016, Conversion Logic invested several years and significant resources in specifically developing its custom product and service offerings to AARP over the course of its business relationship.

**J.    Testwuide improperly sought additional insider financial information about Conversion Logic for the benefit of his competing company.**

237.  Testwuide's attempts to take advantage of Conversion Logic confidential information did not stop with his theft of trade secrets, employees, and customers. Approximately a year-and-a-half after having founded a direct competitor to Conversion Logic, Testwuide sought to gain improper advantage by accessing Conversion Logic confidential financial information.

238.  Testwuide attempted to leverage his shareholder status to obtain insider financial information.

239. On August 13, 2018, Testwuide contacted Steve Dang, Conversion Logic's Chief Financial Officer. In this correspondence, Testwuide sought a

financial update on the company, including "a current income statement and balance sheet."

240. Dang responded clearly that Testwuide was not entitled to this information simply by nature of being a shareholder. Dang expressly confirmed that this information was considered to be confidential.

241. Despite Dang's clear statement that Testwuide was seeking confidential information, Testwuide pressed for more later that same day: "I should have information rights. What can you share?"

242. Two days later, having investigated the issue further, Dang confirmed again that the information Testwuide sought was confidential and that Conversion Logic was "not able to share any financial info."

243. Testwuide did not relent and, on August 20, 2018, again demanded access to information. He claimed he was entitled to it "given my investment, ownership position and contribution to Conversion Logic."

244. Testwuide sought Conversion Logic's confidential financial information out of interest in furthering his competing company.

245. Testwuide is in breach of his fiduciary duty of good faith in dealing with Conversion Logic by attempting to obtain confidential Conversion Logic financial information for the benefit of his own competing company.

**K.    Testwuide has repeatedly disparaged Conversion Logic both publicly and privately.**

246. Following his departure from Conversion Logic, Testwuide has disparaged Conversion Logic both privately and publicly to Conversion Logic's detriment.

247. Testwuide privately disparaged Conversion Logic to both current and potential investors, insulting its leadership and its board of directors. Testwuide has called Conversion Logic's financial stability and future into question.

248. In an email dated January 21, 2019, Testwuide wrote to an angel investor, Clark Landry, that ever since his January 2017 departure the company is very disappointing:

> As an industry insider still living in the marketing analytics category, it looks very disappointing what has happened to Conversion Logic over the last two years.

249. In this same email, Testwuide insults Conversion Logic's leadership and performance: "I can say with certainty a lack of leadership and poor execution are at fault."

250. Testwuide reminded the investor that he is a shareholder in Conversion Logic when he made these remarks: "I will remain hopeful for some return on our investment."

251. Testwuide has similarly privately disparaged Conversion Logic to other investors and potential investors.

252. Conversion Logic is a private company that relies on funding from investors for its continued growth and success. Disparaging remarks about its business operations, financial stability, leadership, and execution can be extremely harmful to Conversion Logic's ability to fundraise and maintain credibility with potential investors. This is especially true when disparaging remarks come from a shareholder in the company.

253. Testwuide, through his employer Measured, has also publicly disparaged Conversion Logic.

254. On or about May 14, 2019, in a Measured press release, blasted Conversion Logic's business of multi-touch attribution. The article is titled "Multi-touch Attribution is dead."

255. Testwuide is directly quoted in the article denigrating Conversion Logic's business of multi-touch attribution. Testwuide describes it as plagued by numerous technical and operational issues:

The promise of marketing measurement beyond last-click has failed to deliver for marketers. Multi-touch attribution has been plagued by severe data reconciliation issues, walled garden blind spots, the collapse of third-party tracking, challenges of identity and GDPR, and painful on-boarding," said Trevor Testwuide, co-founder and CEO at Measured.

256.  Testwuide is directly quoted claiming that cross-channel marketing measurement—Conversion Logic's business—is a failure: "Cross-channel marketing has failed marketers."

257.  Separately, on May 15, 2017, TechCrunch, a widely-read online publication focused on the technology industry, published an article quoting Testwuide making further disparaging comments about Conversion Logic and its business.

258.  Testwuide described multi-touch attribution, which is Conversion Logic's business, as "a fool's errand." He stated this approach "has serious limitations."

259.  Both articles indicate that Testwuide was formerly the CEO and Co-Founder of Conversion Logic.

260.  By making such disparaging and harmful remarks, Testwuide has violated Section 13 of his Separation Agreement, in which he agreed not to disparage Conversion Logic, including making disparaging statements about its "business, products, intellectual property, financial standing, [or] future . . ."

261.  By disparaging Conversion Logic, Testwuide has violated his fiduciary duty of good faith in dealing with Conversion Logic.

262.  Conversion Logic is harmed by Testwuide's public disparaging remarks. Testwuide's public comments are particularly damaging because they are presented in a context in which he is described as Conversion Logic's former CEO. The context for these statements thus suggests his disparagement is credible and based on insider information.

263. Testwuide's public disparaging remarks are also harmful because they are widely published and designed to be read by key members of the industry including potential investors, existing customers, and potential customers.

264. Testwuide's public and private disparaging statements have inflicted and will continue to inflict irreparable harm to Conversion Logic's reputation and the goodwill that it has invested in developing with its customers, vendors, other third-party partners, as well as its investors and potential investors.

## FIRST CAUSE OF ACTION
### Misappropriation of Trade Secrets under 18 U.S.C. § 1836(b) and Cal. Civil Code § 3426
### (Against All Defendants)

265. Conversion Logic incorporates the allegations set forth in paragraphs 1 through 264 as though fully set forth herein.

266. Conversion Logic is the owner of certain valuable, confidential and proprietary information, including but not limited to proprietary machine-learning processes, techniques, models, and software as well as non-public sales information relating to its customers and prospective customers, pricing information, contract details, subscription agreements, revenues, and other customer relationship information.

267. This information constitutes trade secrets that enable Conversion Logic to conduct its business, serve customers, and maintain its competitive advantage in the market.

268. Conversion Logic keeps this information secret; it is accessible only to parties with permission to view such information, only after they have agreed to contracts that include strict confidentiality provisions that require them not to use or disclose this information. Conversion Logic only makes this information available to these parties via secure, password-protected software and tools. Should these trade secrets be accessible to individuals or businesses outside of Conversion

1  Logic, they could be used to economically harm Conversion Logic and enrich the

2  possessor.

3       269. Measured is in possession of the foregoing trade secrets, which are

4  subject to confidentiality agreements in which Conversion Logic's employee

5  Testwuide and advisors Bharadwaj and Magnaghi expressly acknowledged and

6  confirmed their confidential and proprietary nature.

7       270. During his employment, Testwuide had access to this trade secret

8  information both physically and via a Conversion Logic-owned laptop computer

9  and various Conversion Logic-owned and controlled databases and systems.

10      271.  Upon his hiring, Testwuide agreed to the terms of his Confidentiality

11 Agreement, which prohibits the use and disclosure of Conversion Logic trade

12 secret information.

13      272. Testwuide misappropriated Conversion Logic's trade secret information

14 at least at the date of his departure from Conversion Logic in January 2017.

15      273.  Relying on the confidential, sensitive, and proprietary information he

16 gained during his employment with Conversion Logic, Testwuide co-founded a

17 directly competing company, Measured.

18      274.  During his ongoing advisory engagement and multiple consulting

19 engagements with Conversion Logic, Bharadwaj also had access to this trade secret

20 information both physically and via various Conversion Logic-owned and

21 controlled databases and systems.

22      275.  Upon each of his engagements, Bharadwaj agreed to the terms of this

23 Advisor Agreement and Consulting Agreements, each of which prohibit the use

24 and disclosure of Conversion Logic trade secret information.

25      276.  Bharadwaj misappropriated Conversion Logic's trade secret information.

26      277.  Relying on the confidential, sensitive, and proprietary information he

27 gained during his engagements with Conversion Logic, Bharadwaj co-founded a

28 directly competing company, Measured.

278. During his advisory engagement with Conversion Logic, Magnaghi had access to Conversion Logic's confidential, sensitive, and proprietary information both physically and via various Conversion Logic-owned and controlled databases and systems.

279. Magnaghi agreed to the terms of his Advisory Services Letter Agreement, which prohibits the use and disclosure of Conversion Logic trade secret information.

280. Magnaghi misappropriated Conversion Logic's trade secret information.

281. Testwuide's misappropriation of Conversion Logic's trade secrets has caused significant damage to Conversion Logic's trade secrets in an amount to be determined at trial.

282. Bharadwaj's misappropriation of Conversion Logic's trade secrets has caused significant damage to Conversion Logic's trade secrets in an amount to be determined at trial.

283. Magnaghi's misappropriation of Conversion Logic's trade secrets has caused significant damage to Conversion Logic's trade secrets in an amount to be determined at trial.

284. Defendants have and continually will misappropriate Conversion Logic's trade secrets by using these trade secrets without authority to develop a directly competing machine-learning based software product and to attempt to solicit current and prospective customers away from Conversion Logic.

285. As a direct and proximate result of Defendants' current and continued misappropriation of Conversion Logic's trade secrets, Conversion Logic will suffer imminent and irreparable harm.

286. Unless enjoined by this Court, Defendants' acts of misappropriation will continue, and Conversion Logic will continue to suffer irreparable harm.

287. Conversion Logic requests that this Court enjoin Defendants from utilizing any trade secret information obtained from Conversion Logic in any way.

288. Defendants' current and continued misappropriation of Conversion Logic's trade secrets is reckless and malicious. Defendants know of the confidentiality, ownership and use restrictions on these trade secrets. Therefore, Conversion Logic is entitled to an award of punitive or treble damages and attorney's fees pursuant to California Civil Code Sections 3426.3(c) and 3426.4.

## SECOND CAUSE OF ACTION
### Breach of Contract
### (Against Testwuide)

289. Conversion Logic incorporates the allegations set forth in paragraphs 1 through 288 as though fully set forth herein.

290. Testwuide's May 1, 2014 Confidentiality Agreement is a valid and enforceable agreement.

291. At all times Conversion Logic performed all obligations required of it under the Confidentiality Agreement.

292. At no time was Testwuide's performance under the Confidentiality Agreement excused.

293. Testwuide acknowledged that his obligations to maintain the confidentiality of Conversion Logic's trade secrets "will survive expiration or termination of this Confidentiality, Inventions and Non-Solicitation Agreement (this "Agreement"), and [Testwuide's] employment with the Company . . ."

294. Testwuide breached the Confidentiality Agreement by stealing and keeping in his possession Conversion Logic trade secrets and confidential and proprietary information including both technical information such as proprietary machine-learning techniques, models, and software, as well as non-public sales information such as account contacts, pricing information, contract details, subscription agreements, revenues after termination of his employment.

295.  Testwuide breached the Confidentiality Agreement by refusing to return Conversion Logic's materials in his possession that contain Conversion Logic confidential information, including his company-issued laptop.

296.  Testwuide breached the Confidentiality Agreement by soliciting both Bharadwaj, a known advisor to and consultant for Conversion Logic, and other former employees of Conversion Logic including Dean Polley.

297.  Testwuide breached the Confidentiality Agreement by soliciting Antonio Magnaghi, a known advisor to Conversion Logic, to become an advisor to Measured.

298.  Testwuide breached the Confidentiality Agreement by soliciting customers of Conversion Logic to become customers of Measured including but not limited to AARP.

299.  Testwuide breached the Confidentiality Agreement to the extent that he developed discoveries or inventions while at Conversion Logic or in the year following his employment and failed to promptly disclose and assign them to Conversion Logic.

300.  In addition, Testwuide's August 2017 Separation Agreement is a valid and enforceable agreement.

301.  At all times Conversion Logic performed all obligations required of it under the Separation Agreement.

302.  At no time was Testwuide's performance under the Separation Agreement excused.

303.  Testwuide breached the Separation Agreement by stealing and misappropriating Conversion Logic's trade secrets and confidential and proprietary information including both technical information such as proprietary machine-learning techniques, models, and software, as well as non-public sales information such as account contacts, pricing information, contract details, subscription agreements, revenues after termination of his employment.

304. Testwuide breached the Separation Agreement by soliciting both Bharadwaj, a known advisor to and consultant for Conversion Logic, Antonio Magnaghi, a known advisor to Conversion Logic, and other former employees of Conversion Logic to become employees of Measured, including Dean Polley.

305. Testwuide breached the Separation Agreement by disparaging Conversion Logic both privately and publicly, including to potential investors, customers, and others.

306. As a direct and proximate result of each of Testwuide's breaches of the Confidentiality Agreement and the Separation Agreement, Conversion Logic has been harmed in an amount to be proven at trial.

**THIRD CAUSE OF ACTION**
**Breach of Contract**
**(Against Bharadwaj)**

307. Conversion Logic incorporates the allegations set forth in paragraphs 1 through 306 as though fully set forth herein.

308. Bharadwaj's June 15, 2015 Advisor Agreement is a valid and enforceable agreement.

309. At all times Conversion Logic performed all obligations required of it under the Advisor Agreement.

310. At no time has Bharadwaj's performance under the Advisor Agreement been excused.

311. At no time has Bharadwaj attempted to terminate the Advisor Agreement.

312. Bharadwaj agreed that he would hold in confidence Conversion Logic's trade secrets "not disclose or, except in performing the Services, use any Proprietary information."

313. Bharadwaj acknowledged that his obligations to maintain the confidentiality of Conversion Logic's trade secrets, along with his inventions-

1  assignment and non-solicit obligations "and any remedies for breach of this

2  Agreement shall survive any termination or expiration."

3      314.  Bharadwaj breached the Advisor Agreement by stealing and

4  misappropriating Conversion Logic's trade secrets and confidential and proprietary

5  information including both technical information such as proprietary machine-

6  learning techniques, models, and software, as well as non-public sales information.

7      315.  Bharadwaj breached the Advisor Agreement by soliciting both

8  Testwuide and other known employees of Conversion Logic to become employees

9  of Measured, including Dean Polley.

10      316.  Bharadwaj also breached the Advisor Agreement by soliciting Magnaghi,

11  a known advisor to Conversion Logic, to become an advisor to Measured.

12      317.  Bharadwaj breached the Advisor Agreement by providing his services to

13  Measured, a company that directly competes with Conversion Logic and by failing

14  to keep Conversion Logic informed of this conflict of interest.

15      318.  Bharadwaj breached the Advisor Agreement to the extent that he

16  developed inventions, works of authorships, mask works, designations, designs,

17  know-how, ideas or information arising from or in connection with his advisory

18  services to Conversion Logic and failed to promptly disclose and assign them to

19  Conversion Logic or otherwise claims them as his own.

20      319.  Bharadwaj's September 24, 2015 First Consulting Agreement is a valid

21  and enforceable agreement.

22      320.  At all times Conversion Logic performed all obligations required of it

23  under the First Consulting Agreement.

24      321.  At no time has Bharadwaj's performance under the First Consulting

25  Agreement been excused.

26      322.  Bharadwaj acknowledged under the First Consulting Agreement that his

27  obligations to maintain the confidentiality of Conversion Logic's trade secrets "will

28

1  survive expiration or termination of this Agreement and Contractor's engagement

2  with Company . . ."

3      323.  Bharadwaj further acknowledged under the First Consulting Agreements

4  that his obligations related to the ownership and assignment of discoveries and

5  work product "will continue beyond the termination of Contractor's engagement

6  by Company with respect to Discoveries and Work product conceived or made by

7  Contractor along or in concert with others during Contractor's engagement with

8  Company in connection with the performance of services for Company, whether

9  pursuant to this Agreement or otherwise."

10     324.  Bharadwaj breached the First Consulting Agreement by stealing and

11 misappropriating Conversion Logic's trade secrets and confidential and proprietary

12 information including both technical information such as proprietary machine-

13 learning techniques, models, and software, as well as non-public sales information.

14     325.  Bharadwaj breached the First Consulting Agreement to the extent that

15 he developed any discoveries and work product during the term of his engagement

16 with Conversion Logic or in connection with the performance of those services for

17 Conversion Logic including: "inventions, discoveries, improvements, and

18 copyrightable works (including, without limitation, any information relating to

19 [Conversion Logic's] software products, source code, know-how, processes,

20 designs, algorithms, computer programs and routines, formulae, techniques,

21 developments or experimental work, work-in-progress, or business trade secrets),"

22 in any instance where Bharadwaj failed to promptly disclose and assign them to

23 Conversion Logic or otherwise claims them as his own.

24     326.  Bharadwaj's June 1, 2016 Second Consulting Agreement is a valid and

25 enforceable agreement.

26     327.  Bharadwaj is personally liable for any breach of the Second Consulting

27 Agreement.

28

328. At all times Conversion Logic performed all obligations required of it under the Second Consulting Agreement.

329. At no time has Bharadwaj's performance under the Second Consulting Agreement been excused.

330. Bharadwaj breached the Second Consulting Agreement by stealing and misappropriating Conversion Logic's trade secrets and confidential and proprietary information including both technical information such as proprietary machine-learning techniques, models, and software, as well as non-public sales information.

331. Bharadwaj breached the Second Consulting Agreement to the extent that he developed any work product that arose out of or resulted from his performance under the Agreement, including: "any computer software programs, documentation, algorithms, materials, inventions, ideas, written material or other tangible or intangible property," in any instance where Bharadwaj failed to deliver such work product to Conversion Logic or otherwise claim it has his own.

332. Bharadwaj breached the Second Consulting Agreement by co-founding Measured and offering his services to a company that is "directly competitive to Conversion Logic's offerings" during the term of the Second Consulting Agreement.

333. Bharadwaj breached the Second Consulting Agreement by soliciting known Conversion Logic employees, including Testwuide and Dean Polley, to be employees of Measured within one year after the term of the Agreement—without obtaining Conversion Logic's written consent.

334. Bharadwaj also breached the Second Consulting Agreement by soliciting Conversion Logic advisor Magnaghi to become an advisor to Measured, within one year after the term of the Agreement.

335. Bharadwaj breached the Second Consulting Agreement by soliciting customers of Conversion Logic to become customers of Measured, within one year after the term of the Agreement, including but not limited to AARP.

336.  As a direct and proximate result of each of Bharadwaj's breaches of the Advisor Agreement and First and Second Consulting Agreements, Conversion Logic has been harmed in an amount to be proven at trial.

## FOURTH CAUSE OF ACTION
### Breach of Contract
### (Against Magnaghi)

337.  Conversion Logic incorporates the allegations set forth in paragraphs 1 through 336 as though fully set forth herein.

338.  Magnaghi's August 26, 2014 Advisory Services Letter Agreement is a valid and enforceable agreement.

339.  Magnaghi is personally liable for any breach of his Advisor Agreement.

340.  At all times Conversion Logic performed all obligations required of it under his Advisor Agreement.

341.  At no time has Magnaghi's performance under his Advisor Agreement been excused.

342.  At no time has Magnaghi attempted to terminate his Advisor Agreement.

343.  Magnaghi agreed that he would hold in confidence Conversion Logic's trade secrets and "will not, directly or indirectly, disclose, furnish, make available or utilize any Confidential Information other than in the course of performing the Services as an Advisor of the Company."

344.  Magnaghi further agreed that any inventions, ideas, developments, or discoveries he developed during the term of his services or within one year following termination are assigned to Conversion Logic.

345.  Magnaghi agreed to a no-conflicts provision along with his confidentiality and inventions-assignment obligations not to perform "any services for or otherwise participate[e] in a company developing or commercializing new services, methods or devices that may be competitive with the Company."

346.  Magnaghi breached his Advisor Agreement by stealing and misappropriating Conversion Logic's trade secrets and confidential and proprietary information including both technical information such as proprietary machine-learning techniques, models, and software, as well as non-public sales information.

347.  Magnaghi breached his Advisor Agreement to the extent that he developed ideas, inventions, discoveries or other developments relating or resulting from Conversion Logic's "actual or anticipated business, work, research or investigation," and failed to promptly disclose and assign them to Conversion Logic or otherwise claims them as his own.

348.  Magnaghi breached his Advisor Agreement by providing his services to Measured, a company that directly competes with Conversion Logic and by failing to keep Conversion Logic informed of this conflict of interest.

349.  As a direct and proximate result of each of Magnaghi's breaches of his Advisor Agreement, Conversion Logic has been harmed in an amount to be proven at trial.

**FIFTH CAUSE OF ACTION**
**Unjust Enrichment/Restitution**
**(Against Measured)**

350.  Conversion Logic incorporates the allegations set forth in paragraphs 1 through 349 as though fully set forth herein.

351.  Measured has been enriched in the form of highly-valuable Conversion Logic confidential and proprietary information including its technical and sales-related trade secrets.

352.  Testwuide, Bharadwaj, and Magnaghi were not entitled to these trade secrets, which they unlawfully stole from Conversion Logic.

353.  This enrichment has occurred at the expense of Conversion Logic, which spent several years and hundreds of thousands of dollars in the research and development of its product and the machine-learning algorithms and models that

1  support it, in addition to developing proprietary customer and sales-related
2  information.

3      354.  Measured has been unjustly enriched at the expense of Conversion
4  Logic. Conversion Logic is entitled to restitution in an amount to be established at
5  trial.

**SIXTH CAUSE OF ACTION**
**Fraud**
**(Against Testwuide)**

9      355.  Conversion Logic re-alleges and incorporates by reference the allegations
10  set forth in paragraphs 1 through 354 as though fully set forth herein.

11     356.  Upon his departure from Conversion Logic and for the following seven
12  months, through the course of negotiating the terms of his Separation Agreement,
13  Testwuide represented to Conversion Logic that he was in compliance with the
14  terms of his Confidentiality Agreement.

15     357.  For example, on January 26, 2017, in an email to Baumgart titled "Re:
16  Thank you!" Testwuide represented that he would agree to terms that included a
17  provision "not to solicit any Conversion Logic employees for 1 year." On or
18  around that date, however, Testwuide had begun soliciting a Conversion Logic
19  advisor, Madan Bharadwaj, to co-found a competing company together with him.

20     358.  Subsequently on, January 27, 2017, Testwuide left Conversion Logic. On
21  or by that date, he took with him Conversion Logic property and trade secrets.

22     359.  On January 30, 2017, in an email to Baumgart, Testwuide represented
23  that he had "been extremely cooperative during this entire separation process."

24     360.  At no time after that did Testwuide advise Conversion Logic that he had
25  stolen Conversion Logic property and trade secrets, in direct violation of this
26  Confidentiality Agreement.

27     361.  At least by March 13, 2019 Testwuide had founded a competing
28  company, Measured.

54
COMPLAINT

362.  At no time after that did Testwuide advise Conversion Logic that he had founded a directly competing company, in direct violation of this Confidentiality Agreement. Instead, Testwuide intentionally maintained his competing company in stealth mode.

363.  From June 2017 through August 2017, Testwuide negotiated a Separation Agreement with Conversion Logic. In these negotiations, Testwuide did not reveal and continued to conceal that he had stolen Conversion Logic property and trade secrets, had already founded a competing company using that stolen information, and solicited a known Conversion Logic advisor to co-found that directly competing company together with him.

364.  Testwuide's additional misrepresentations include a statement in an email dated August 11, 2017, titled "Thoughts on Next Steps," in which Testwuide represented that he desired to be a professional ally to Conversion Logic.

365.  Testwuide also falsely stated in that same email that both he and Bharadwaj would be ambassadors for and support Conversion Logic, stating: "I do think Madan and I can help, if nothing more as brand ambassadors eyes/ears in the market."

366.  As set forth in detail herein, Testwuide's representations, including purporting to negotiate in good faith, were false.

367.  Within the approximately one month of his departure from Conversion Logic, Testwuide had stolen Conversion Logic trade secret information, returned his company laptop only after deleting all Conversion Logic's trade secrets thereon, destroying evidence of his theft, co-founded a directly competing company, Measured, used Conversion Logic's trade secrets to support Measured, and solicited Conversion Logic advisor and consultant Bharadwaj to co-found Measured with him.

368. Testwuide intended to keep his theft, improper solicitation, and other offenses secret from Conversion Logic, including by refusing to return his company-issued laptop in its ordinary condition (which could have been subject to forensic analysis), returning a wiped-clean laptop instead, and by maintaining Measured in "stealth" mode.

369. Testwuide intended for Conversion Logic to rely on his representations that he was in compliance with the terms of his Confidentiality Agreement while negotiating the terms of his Separation Agreement, the terms of which put Testwuide in a significantly more advantageous financial position.

370. Conversion Logic reasonably relied on Testwuide's misrepresentations when it agreed to the terms of the Separation Agreement including 1) the forgiveness of Testwuide's loan principal and interest, and 2) the acceleration and grant of certain stock options.

371. Conversion Logic's reliance on Testwuide's misrepresentation was the sole cause of Conversion Logic's harm.

## SEVENTH CAUSE OF ACTION
### Concealment
### (Against Testwuide)

372. Conversion Logic re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 371 as though fully set forth herein.

373. Conversion Logic and Testwuide were in a fiduciary relationship, including because Testwuide was a former officer of the company and because both parties were negotiating Testwuide's Separation Agreement.

374. Testwuide intentionally failed to disclose certain facts to Conversion Logic; namely, that he had stolen its trade secrets, founded a directly competing company, and improperly solicited a known Conversion Logic advisor to do so together with him.

375.   Testwuide intentionally kept this information secret including by not disclosing it and by wiping his company-issued laptop before returning it, thereby preventing forensic analysis to evaluate Testwuide's theft of Conversion Logic trade secrets and other illicit acts. Testwuide also kept this information secret by maintaining his new company in stealth mode.

376.   Testwuide intended to deceive Conversion Logic by concealing these facts.

377.   Testwuide knew that this information was material to Conversion Logic, not only in the course of negotiating his Separation Agreement but in seeking immediate recourse against Testwuide, Bharadwaj, and Measured. In an email dated August 24, 2017, he sought to induce Conversion Logic to release and waive all claims against him.

378.   Conversion Logic did not know of any of these concealed facts.

379.   Had this concealed information been disclosed, Conversion Logic reasonably would have behaved differently.

380.   Conversion Logic was harmed by this concealment.

381.   Testwuide's conduct was a substantial factor in causing Conversion Logic harm, resulting in damages in an amount to be determined at trial.

## EIGHTH CAUSE OF ACTION
### Conversion
### (Against Testwuide)

382. Conversion Logic re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 381 as though fully set forth herein.

383. Conversion Logic has rightful ownership over and a right to possess: a) all amounts loaned and granted to Testwuide; b) all stock options granted to Testwuide; c) Conversion Logic's computer it had issued to Testwuide to use in the scope of his employment; d) the information and data stored on the computer it had issued to Testwuide to use in the scope of his employment; and e) Conversion Logic's proprietary information, which Testwuide could have accessed using this computer, including any ideas, discoveries, or, work product developed by Testwuide during the course of his employment at Conversion Logic and the following year.

384. Testwuide intentionally and substantially interfered with Conversion Logic's possession of this property when he failed to return his company-issued computer; stole Conversion Logic proprietary ideas, discoveries, and work product; withheld information about his directly competing company in securing forgiveness of a $260,000 loan from Conversion Logic; and withheld the same in securing acceleration and purchase of 1,375,000 shares of common stock in Conversion Logic.

385. Conversion Logic did not consent to Testwuide's actions and was dispossessed of its right to the exclusive use and possession of each of the items identified above.

386. Testwuide's actions were the sole cause of Conversion Logic's harm resulting in damages in an amount to be determined at trial.

387. Testwuide's tortious conduct was willful and malicious, warranting an award of punitive damages in addition to the full value of the converted property.

**NINTH CAUSE OF ACTION**
**Conversion**
**(Against Bharadwaj)**

388. Conversion Logic re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 387 as though fully set forth herein.

389. Conversion Logic has rightful ownership over and a right to possess any ideas, discoveries, and work product developed by Bharadwaj during the course and arising out of or resulting from his advisor engagement with Conversion Logic and his consulting engagements with Conversion Logic.

390. Bharadwaj intentionally and substantially interfered with Conversion Logic's possession of this property when he stole Conversion Logic's proprietary, ideas, discoveries, and work product he developed in connection with his advisor and consultant services for Conversion Logic.

391. Conversion Logic did not consent to Bharadwaj's actions and was dispossessed of its right to the exclusive use and possession of these ideas, discoveries, and work product.

392. Bharadwaj's actions were the sole cause of Conversion Logic's harm resulting in damages in an amount to be determined at trial.

393. Bharadwaj's tortious conduct was willful and malicious, warranting an award of punitive damages in addition to the full value of the converted property.

**TENTH CAUSE OF ACTION**
**Conversion**
**(Against Magnaghi)**

394. Conversion Logic re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 393 as though fully set forth herein.

395. Conversion Logic has rightful ownership over and a right to possess any ideas, discoveries, and work product developed by Magnaghi during the course and arising out of or resulting from his advisor engagement with Conversion Logic.

396.  Magnaghi intentionally and substantially interfered with Conversion Logic's possession of this property when he stole Conversion Logic's proprietary ideas, discoveries, and work product he developed in connection with his advisor and consultant services for Conversion Logic.

397.  Conversion Logic did not consent to Magnaghi's actions and was dispossessed of its right to the exclusive use and possession of these ideas, discoveries, and work product.

398.  Magnaghi's actions were the sole cause of Conversion Logic's harm resulting in damages in an amount to be determined at trial.

399.  Magnaghi's tortious conduct was willful and malicious, warranting an award of punitive damages in addition to the full value of the converted property.

## ELEVENTH CAUSE OF ACTION
### Intentional Interference with a Contractual Relationship
### (Against All Defendants)

400.  Conversion Logic incorporates the allegations set forth in paragraphs 1 through 399 as though fully set forth herein.

401.  Conversion Logic had a valid and binding contract with AARP, reflected in the AARP Master Services Agreement. Conversion Logic also had multiple valid and binding contracts with AARP in the form of Sales Orders under the AARP Master Services Agreement.

402.  The term of the AARP Master Services Agreement was open-ended and not terminated by Conversion Logic.

403.  Testwuide, Bharadwaj, and Magnaghi, and thus Measured, knew of the AARP Master Services Agreement. Testwuide had direct knowledge of the terms of the AARP Master Services Agreement because he personally executed the agreement on Conversion Logic's behalf, along with additional Sales Orders.

404.  Defendants prevented Conversion Logic's performance of the AARP Master Services Agreement by soliciting AARP to become a customer of

Measured. Defendants relied on stolen trade secrets from Conversion Logic in order to solicit AARP to become a customer of Measured. Additionally, Testwuide and Bharadwaj each violated the terms of their respective agreements with Conversion Logic by soliciting a known customer of Conversion Logic.

405. Defendants intended to disrupt the contractual relationship between Conversion Logic and AARP in order to steal a prominent customer from Conversion Logic to support their new company.

406. Conversion Logic was harmed by this disruption, including the loss of business of AARP.

407. Defendant's conduct was a substantial factor in causing Conversion Logic harm, resulting in damages in an amount to be determined at trial.

## TWELFTH CAUSE OF ACTION
### Intentional Interference with Prospective Economic Advantage
### (Against All Defendants)

408. Conversion Logic incorporates the allegations set forth in paragraphs 1 through 407 as though fully set forth herein.

409. Conversion Logic was in an ongoing economic relationship with AARP, reflected in the AARP Master Service Agreement and multiple Sales Orders under that Agreement. Conversion Logic's economic relationship with AARP would have resulted in an economic benefit to Conversion Logic.

410. Defendants knew of the economic relationship between Conversion Logic and AARP.

411. Defendants interfered with the economic relationship between Conversion Logic and AARP by soliciting AARP to become a customer of Measured. Defendants relied on stolen trade secrets from Conversion Logic in order to solicit AARP to become a customer of Measured. Additionally, Testwuide and Bharadwaj each violated the terms of their respective agreements with Conversion Logic by soliciting a known customer of Conversion Logic.

412.  Defendants intended to disrupt the economic relationship between Conversion Logic and AARP in order to steal a prominent customer from Conversion Logic to support their new company.

413.  Conversion Logic was harmed by this disruption, including the loss of business of AARP.

414.  Defendant's conduct was a substantial factor in causing Conversion Logic harm, resulting in damages in an amount to be determined at trial.

415.  In addition, Conversion Logic has an economic relationship with its investors and potential investors. In these relationships, if Conversion Logic can convince these investors and potential investors of the continued growth and success of the company, Conversion Logic stands to gain additional funding.

416.  Testwuide, as a named founder, former CEO, and President of Conversion Logic, is personally aware of the relationships Conversion Logic has with its initial investors and is aware of other relationships Conversion Logic has with potential investors.

417.  Testwuide has intentionally engaged in making inaccurate disparaging comments to Conversion Logic's potential investors, in direct contravention of the terms of his Separation Agreement. Testwuide has sent unsolicited emails to Conversion Logic investors and potential investors, including Clark Landry, in order to make these disparaging and damaging comments.

418.  By engaging in this conduct, Testwuide has intended to disrupt the relationships that Conversion Logic has with its investors and potential investors.

419.  Conversion Logic's economic relationship with its investors and potential investors has been harmed as a result and Testwuide's conduct was a substantial factor in causing that harm.

## THIRTEENTH CAUSE OF ACTION
### Breach of Fiduciary Duty
### (Against Testwuide)

420. Conversion Logic incorporates the allegations set forth in paragraphs 1 through 419 as though fully set forth herein.

421. Testwuide was CEO and President of Conversion Logic and was obligated to act on behalf of Conversion Logic, including safeguarding the confidential, sensitive, and proprietary information that he received during the course of his duties.

422. Testwuide owed a fiduciary duty of good faith in dealing with Conversion Logic.

423. When Testwuide stole Conversion Logic's confidential and proprietary information; destroyed evidence of this by wiping his company-issued computer; co-founded a directly competing company in secret; solicited employees, customers and advisors while at Conversion Logic; made disparaging remarks about Conversion Logic to investors and customers; and when he sought to obtain confidential financial information about Conversion Logic for his own competitive advantage, Testwuide failed to act in accord with his fiduciary duty of good faith in dealing with Conversion Logic.

424. Testwuide's actions were the sole cause of Conversion Logic's harm, loss of data and information, loss of funds, loss of shares, loss of customers, loss of goodwill, and damages in an amount to be determined at trial.

## RELIEF REQUESTED

Plaintiff Conversion Logic, Inc. requests that the Court enter judgment in its favor against Defendants Measured, Inc., Trevor Testwuide, Madan Bharadwaj, and Antonio Magnaghi joint and severally on all of Conversion Logic's causes of action as follows:

    a.    An order and permanent injunction prohibiting each Defendant from

utilizing any trade secret information obtained from Conversion Logic in any way;

b.  An order and permanent injunction prohibiting each Defendant from wrongfully interfering with Conversion Logic's contracts and economic relationships with its customers identified in Conversion Logic's stolen and confidential sales records;

c.  Restitution in an amount to be determined at trial;

d.  Rescission of Testwuide's Separation Agreement;

e.  Compensatory damages in an amount to be determined at trial;

f.  Punitive damages;

g.  Treble damages for willful and malicious misappropriation of trade secrets;

h.  Punitive damages for willful and malicious misappropriation of trade secrets;

i.  Attorney's fees for willful and malicious misappropriation of trade secrets;

j.  Disgorgement of all amounts paid over and above the amounts owed to Defendant Testwuide, including the forgiveness of a loan and the issuance and acceleration of stock options; and

k.  Any other relief as the Court deems appropriate.

COMPLAINT

1  Dated: June 25, 2019

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

NEWMAN DU WORS LLP

Derek A. Newman, State Bar No. 190467
Sarah L. Forney, State Bar No. 254769
100 Wilshire Blvd., Suite 700
Santa Monica, CA 90401
Telephone:          (310) 359-8200
Facsimile:          (310) 359-8190
Email:        *dn@newmanlaw.com*
              *sf@newmanlaw.com*

Counsel for Plaintiff
Conversion Logic, Inc.

# JURY DEMAND

Under Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff Conversion Logic, Inc. demands a trial by jury of all issues presented in this Complaint which are so triable.


Dated: June 25, 2019     Respectfully submitted,

           NEWMAN DU WORS LLP


           Derek A. Newman, State Bar No. 190467
           Sarah L. Forney, State Bar No. 254769
           100 Wilshire Blvd., Suite 700
           Santa Monica, CA 90401
           Telephone:   (310) 359-8200
           Facsimile:   (310) 359-8190
           Email:    *dn@newmanlaw.com*
                   *sf@newmanlaw.com*

           Counsel for Plaintiff
           Conversion Logic, Inc.